IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JIAN BIN TANG,

       Petitioner,

vs.                                                    Case Number 4:06cv277-MP/WCS

ALBERTO GONZALES,
MICHAEL CHERTOFF,
MICHAEL ROZOS,
DAVID HARVEY, and
DEPARTMENT OF
HOMELAND SECURITY

       Respondents.

_____/


## REPORT AND RECOMMENDATION

Petitioner, proceeding *pro se,* initiated this action on June 8, 2006, with the filing of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Doc. 1.  Service was directed and Respondents filed an Answer to the petition on September 8, 2006.  Doc. 16.  Petitioner filed a reply on September 18, 2006.  Doc. 20.  Petitioner also filed a motion for release from custody, doc. 18, and an objection, doc. 19, clarifying the location where he continues to be detained.

**Claim of the § 2241 petition**

Petitioner's petition for a writ of habeas corpus seeks release from what is claimed to be an indefinite period of custody.  Petitioner does not challenge the final order of removal; rather, he contends that his native country of China "has refused to issue travel documents" and, thus, ICE will not be able to deport him in the "reasonably foreseeable future."  Doc. 1, pp. 1-2.  Petitioner alleges he has been held beyond the presumptively reasonable period of detention as established by Zadvydas v. Davis, 533 U.S. 678 (2001), and asserts his entitlement to release.  In particular, at the time the petition was filed in June, Petitioner alleged that he had been detained a total of some 34 months, with 22 of those months being after issuance of the order of removal.  *Id.* He is currently detained in New Mexico.[1]

**Background Facts**

Petitioner is a native and citizen of the People's Republic of China, having been born there on February 22, 1977.  Doc. 1, p. 3; doc. 16, p. 2.  Petitioner arrived in the United States by ship on July 19, 2003, at St. John, U.S. Virgin Islands "as an alien not in possession of a valid entry document."  Doc. 16, p. 2; doc. 1, p. 4; Ex. A.[2]  Records from Respondents indicate that the U.S. Virgin Island Police Department notified

---

[1] While housed at the Wakulla County jail, Petitioner earned a GED diploma.  Doc. 1, p. 5.  Although Petitioner has never worked in this country, he has a brother who is a lawful permanent resident, lives in Philadelphia, Pennsylvania, and is a chef at a Chinese restaurant.  *Id.*, at 5.  He has a cousin who is a citizen and owns a business. *Id.*  Petitioner states that if he is released, he will reside with his brother in Philadelphia. *Id.*, at 7.

[2] All references to exhibits are to those attached to document 16.

Immigration officials that thirty-four Chinese nationals were "seen roaming around Coral Bay, St. John, USVI."  Doc. 16, Ex. A.  The group of twenty-nine males and five females was "located and taken in to custody."  Ex. A.  The group of aliens reported that their families paid $40,000 to travel from China to St. John, but claimed to "not know the name of the smuggler."  *Id.*  The "Record of Deportable/Inadmissible Alien" which was completed on July 19, 2003, indicates Petitioner refused to sign the form and requested a lawyer.  *Id.*

Petitioner stated in the petition that he "immediately turned himself in to the police on the date [he] arrived" in the United States, "and has remained in INS[3] Custody continuously since that date."  Doc. 1, p. 5; *see also* doc. 16, p. 2.  Petitioner has never been free on the streets of the United States since his arrival in 2003.  *Id.*

Petitioner was given a Notice to Appear in Immigration Court on or about August 6, 2003, and charged as being removable under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act.  Doc. 16, p. 2; Ex. B.[4]  The notice indicates, however, that the asylum officer found Petitioner had "demonstrated a credible fear of persecution or torture."  Ex. B.

---

[3] The Immigration and Naturalization Service (INS) ceased to exist as of March 1, 2003, when its functions were transferred to the newly created Department of Homeland Security.  Immigration and Customs Enforcement (ICE) is now the agency which performs the immigration functions of INS.  Doc. 16, p. 1, fn. 2.

[4] Petitioner was charged as an alien who, at the time of application for admission, was not in possession of a valid or unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.  Doc. 16, p. 2; ex. B.

Petitioner appeared for his removal hearing, which was held in New Orleans on March 19, 2004, and the Immigration Judge denied Petitioner's petition for asylum and petition for withholding removal under the convention against torture.  Doc. 16, Ex. C.  Accordingly, Petitioner was ordered removed from the United States on March 19, 2004.  Doc. 1, p. 6; doc. 16, p. 3.  His appeal was denied by the Board of Immigration Appeals on July 21, 2004.  *Id.; see also* Ex. D.  The Board noted that Petitioner's "persecution claim" lacked veracity and the record supported the Immigration Judge's adverse credibility finding.  Ex. D.

Respondent Michael Rozos, as the Field Operations Director for ICE, requested travel documents from the Chinese Consulate General in Houston, Texas, on August 26, 2004.  Doc. 16, p. 3; Ex. E.  Petitioner was provided with a notice of Warning for Failure to Depart on August 27, 2004.  *Id.*; Ex. F.  The notice advised Petitioner of his obligation to assist in obtaining travel documents and to not hamper efforts being made for his departure.  Ex. F; doc. 16, p. 3.  Although the notice listed several mandatory requirements an alien must do to assist ICE in obtaining travel documents, the form had no boxes checked indicating Petitioner was required to provide additional information.  Ex. F.  Petitioner refused, however, to sign the form, and the deportation officer documented Petitioner's refusal to cooperate.  Doc. 16, p. 3; Ex. F.

A memorandum dated August 27, 2004, has been submitted as evidence.  Doc. 16, ex. G.  It indicates that Petitioner was directed to the deportation interview room to complete "an I-217, as well as for the completion and signature of the passport application as required by the Chinese government prior to consideration of the

issuance of a travel document."  Ex. G.  The memorandum states that numerous

requests were made for Petitioner to sign the I-229, but he "continuously stated, 'No

China . . . no go China, die if go China.' "  Ex. G.  Petitioner refused to complete and sign

the Chinese passport application, and was advised of the penalties and possible

criminal sanctions for failing to comply.  *Id.*  The memorandum states that because it

was unlikely a travel document would be issued without the required form being signed

by Petitioner, it was "recommended that the [Petitioner] be charged with sanctions 305

(refusing to obey an order) and 498 (interference with an officer's duties)."  *Id.*  The

memorandum concludes by stating that another attempt would be made next week to

obtain Petitioner's compliance.  *Id.*

A post-order custody review was conducted on October 21, 2004.  Doc. 16, p. 3;

ex. H.  Following that review, ICE determined that Petitioner should continue in

detention based on his failure to cooperate.  *Id.*, at 3-4; Ex. I.  Petitioner was again

notified that he was "required to make timely and good faith efforts to obtain travel or

other documents necessary" to remove him from the United States.  Ex. I.

On March 16, 2005, Petitioner was served with a notice of Failure to Comply

pursuant to 8 C.F.R. § 241.4(g).  Doc. 16, p. 4; Ex. J.  The notice again informed

Petitioner that he was required to comply with ICE to effect his removal and that his

removal period was extended because of his failure to cooperate.  Doc. 16, p. 4.  It

outlined for Petitioner that he had been given 30 days on August 27, 2004, to comply

with his obligation to assist in obtaining a travel document, had been advised of

requirements he had to complete, and that he had not done so.  Ex. J.  It stated that he

had "failed to provide efforts on [his] part to obtain identity documents."  *Id.*  Further, the notice reported that he "refused to cooperate with requests made by the Peoples Republic of China Consulate, Houston, Texas."  *Id.*  The notice also advised Petitioner that his actions were preventing his removal, that his actions caused his removal period to be extended, and that "continued willful failure or refusal . . . to make timely application in good faith for travel or other documents necessary for [his] departure, or any conspiracy or actions to prevent [his] removal or obstruct the issuance of a travel document," would "subject him to criminal prosecution."  Ex. J.

Petitioner was served on March 16, 2005, with another Warning for Failure to Depart.  Doc. 16, p. 4; Ex. K.  On this notice, there are checkmarks at each requirement indicating Petitioner was to provide numerous documents to assist in his removal.  Ex. K, p. 2.  Specifically, Petitioner was directed to submit passports; apply for a travel document or passport from his embassy or consulate; comply with instructions from the embassy or consulate, submit birth certificates or national identification cards or other documents indicating citizenship, nationality, and place of birth; provide names and addresses of family or friends in the United States; provide names and addresses of family or friends in his country of citizenship; provide ICE with written copies of requests to embassies or consulates requesting issuance of a travel document and any responses to those requests; and solicit permission from another country to accept him so that he could be removed there.  *Id.*

On July 18, 2005, Petitioner was served with another notice of Failure to Comply pursuant to 8 C.F.R. § 241.4(g), advising he was must comply with ICE's efforts to

remove him, that his removal period would be extended again due to his failure to cooperate, and noting that in August, 2004, Petitioner refused to "complete a form provided by the Consulate of China in Houston, Texas."  Doc. 16, p. 4; Ex. L.  Petitioner was directed to make efforts to assist ICE in securing his travel documents.  *Id.*

On April 10, 2006, Petitioner was served with another Warning for Failure to Depart.  Doc. 16, p. 4; Ex. M.  Attached to the warning was another Instruction Sheet listing numerous requirements Petitioner must do to assist in his removal.  Ex. M, p. 2. Once again, every box on the form was checked.  *Id.*

On April 19, 2006, Petitioner was served with yet another Warning for Failure to Depart.  Ex. N.  Once more, the attached Instruction Sheet had every box checked, listing numerous requirements Petitioner must provide to be returned to China.  Ex. N.

On April 26, 2006, the Chinese Vice-Consul informed ICE through a facsimile that Petitioner needed to fill out a Chinese form and provide the Consulate with "further information on identity such as passport or ID card."  Doc. 16, p. 4; Ex. O.  On May 4, 2006, Respondent Rozos, acting on behalf of ICE, provided the Chinese Consulate with the form Petitioner filled out in Chinese.  Doc. 16, p. 5; Ex. P.

On May 11th, an Interpreter with ICE translated the form Petitioner had provided to the Chinese Consulate and it was discovered that Petitioned begged the Consulate to *not* issue him a travel document.  Doc. 16, p. 5; Ex. Q.  Petitioner wrote the following statement:

> I beg you, no matter what, do not process my travel document.  Because I owe a lot of money, if I go back I will die for sure.  My whole family will

> also get in trouble.  I beg you, no matter what, do not process and issue
> my travel document.

Doc. 16, p. 5; Ex. Q.  Petitioner also failed to answer several questions, instead writing

the response, "none."  In light of the questions, those answers are suspect.  For

example, in answering the question, "Date when exited China:" Petitioner wrote "none."

Ex. Q.  In response to naming the port of his exit, he wrote, "none."  *Id.*  As for the

question asking for his passport or Identification Card, Petitioner wrote, "none."  *Id.*  The

form asked for his Identification Number, but Petitioner wrote "none."  *Id.*  The place of

issue is also answered, "none."  *Id.*  Petitioner's birth date is listed as May 6, 1979,

making him approximately twenty-four years old when he left China, but he states that

he had no occupation in China, and in response to the question asking for the company

he worked for, he answered, "none."  Petitioner also failed to state his port of entry into

the United States.  *Id.*

    The following month, on June 8, 2006, Petitioner initiated this § 2241 petition

seeking release from detention.  A month later, on July 7, 2006, the Chinese Consulate

declined to issue a travel document for Petitioner and sixteen other individuals.  Doc.

16, p. 5; Ex. R.  In the letter of denial, the Chinese Consulate states that "there are no

records of their household registration found in China."  Doc. 16, p. 5; Ex. R.  "Therefore

these individuals' Chinese citizenship can not be verified and the Consulate General is

not able to issue travel documents to them."  Ex. R.

    Finally, Respondents have provided evidence that the United States maintains

diplomatic relations with the Chinese government and in prior years, has repatriated a

large number of aliens to China.  Doc. 16, p. 10.  In 2003, 713 persons were returned to China and in 2004, the last year for which statistics are available, some 700 persons were removed from the United States to China.  *Id.*; Ex. S.

In his response to the Answer to the § 2241 petition, Petitioner acknowledges the fact that he "refused to sign the I-229 form on August 27, 2004, when his deportation officer Dean Caputo first time [sic] asked Petitioner to sign the form."  Doc. 20, pp. 1-2. However, Petitioner states that on March 16, 2005, he "signed the form I-229 at Miami Krome detention which his deportation officer Mr. C. McCoy had served him."  *Id.*, at 2. Petitioner states that on July 18, 2005, he filled out a passport application while he was at Wakulla County Jail.  *Id.*  On December 28, 2005, Petitioner states that he "filled out passport application and talked to Chinese consulate again" while at Wakulla County Jail.  *Id.*  Petitioner contends that he signed I-229 forms on at least four more occasions: April 10, April 19, May 3, and August 18, 2006.  *Id.*  Petitioner contends that Respondents can no longer treat him as though he is not cooperating because he states that he "only refused to cooperate one time, and he has cooperate[d] eight times already."  *Id.*, at 2-3.

**Analysis**

This Court has jurisdiction over this § 2241 habeas petition as Petitioner is not challenging a final order of removal, but only seeking release from what he asserts is an unlawful and indefinite period of detention pursuant to <u>Zadvydas v. Davis</u>, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).  Doc. 1.  In <u>Zadvydas</u>, the United States Supreme Court considered a challenge to 8 U.S.C. § 1231(a)(6) and was asked to

decide whether the statute authorized indefinite detention of a removable alien.[5]  The

Court held that the continued detention of legal permanent aliens beyond the mandated

90-day removal period was permissible under the Constitution, but only for as long as

was "reasonably necessary to bring about that alien's removal from the United States."

*Id.*, at 689, 121 S. Ct. at 2498.  The Court interpreted the statute to avoid constitutional

threat by concluding that "once removal is no longer reasonably foreseeable, continued

detention is no longer authorized by statute."  *Id.,* at 699, 121 S.Ct. at 2503.  For the

sake of uniform administration by the federal courts, the Zadvydas Court held that "the

presumptive period during which the detention of an alien is reasonably necessary to

effectuate his removal is six months; after that, the alien is eligible for conditional

release if he can demonstrate that there is 'no significant likelihood of removal in the

reasonably foreseeable future.' "  Clark v. Martinez, 543 U.S. 371, 125 S.Ct. 716, 722,

160 L.Ed.2d 734 (2005), *quoting* Zadvydas, 533 U.S. at 701, 121 S.Ct. at 2505.

In Clark v. Martinez, *supra*, the Court extended its interpretation of 8 U.S.C. §

1231(a)(6) to inadmissible aliens.[6]  The Court concluded that there was no reason why

the period of time reasonably necessary to effect removal would be longer for an

---

[5] Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  8 U.S.C. § 1231(a)(1)(A).

[6] The relevant statute provides: "An alien ordered removed who is inadmissible under section 1182 of this title, removable [for violations of nonimmigrant status or entry conditions, violations of criminal laws, or threatening national security] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."  8 U.S.C. § 1231(a)(6), *quoted in* Benitez v. Wallis, 402 F.3d 1133, 1134 (11th Cir. 2005).

inadmissible alien than for an admissible alien.  <u>Clark</u>, 543 U.S. at 386, 125 S.Ct. at

727.  Thus, it held that the 6-month presumptive detention period prescribed in

<u>Zadvydas</u> should be applicable.  *Id.*  Accordingly, under <u>Clark</u> and <u>Zadvydas</u>, when an

alien shows that he has been held more than six months beyond the removal period

and his removal is not reasonably foreseeable, a § 2241 petition should be granted.

<u>Clark</u>, 543 U.S. at 386-387, 125 S.Ct. at 727; <u>Benitez v. Wallis</u>, 402 F.3d 1133, 1135

(11th Cir. 2005) (relying on <u>Clark</u> to hold that an inadmissible alien can no longer be

detained beyond the statutory 90-day removal period of § 1231(a)(1), where there was

no significant likelihood of removal in the reasonably foreseeable future).

Section 1231(a)(1)(A) provides that the government has a 90-day "removal

period" to remove an alien ordered removed from the United States.  8 U.S.C. §

1231(a)(1)(A).  However, the removal period "shall be extended beyond a period of 90

days and the alien may remain in detention during such extended period if the alien fails

or refuses to make timely application in good faith for travel or other documents

necessary to the alien's departure or conspires or acts to prevent the alien's removal

subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).[7]  Accordingly, the statute

expressly permits an alien to be detained longer than the presumptive removal period,

where the alien acts or conspires to prevent his removal.  Therefore, in considering

whether there appears to be no significant likelihood of Petitioner's removal in the

reasonably foreseeable future, the Court must consider whether Petitioner's removal

has been delayed or extended by Petitioner's own efforts.

---

[7] During the "removal period" an alien must be detained.  8 U.S.C. § 1231(a)(2).

In <u>Sango-Dema v. District Director, I.N.S.</u>, 122 F.Supp.2d 213 (D. Mass. 2000),[8] the court denied habeas relief where the Petitioner was found to be "the cause for the long delay."  The court stated, "[e]ven if this Court were to agree with the courts recognizing a constitutional right to be free from indefinite detention by the INS, an alien cannot trigger such a right with his outright refusal to cooperate with INS officials." <u>Sango-Dema v. District Director, I.N.S.</u>, 122 F.Supp.2d at 221.

In <u>Powell v. Ashcroft</u>, 194 F.Supp.2d 209 (E.D. N.Y. 2002), a case decided in the wake of <u>Zadvydas v. Davis</u>, the court noted that <u>Zadvydas</u> was concerned with the constitutionality of § 1231(a)(6) where aliens were in " ''deportation limbo because their countries of origin had refused to allow [them] entrance.' " <u>Powell</u>, 194 F.Supp.2d at 211, *citing* <u>Sango-Dema</u>, 122 F.Supp.2d at 221 (explaining <u>Zadvydas</u>).  The court held that <u>Zadvydas</u> was inapplicable because it "did not discuss the constitutionality of Section 1231(a)(1)(C) and the tolling of the removal period during the time of an alien's non-cooperation." <u>Powell</u>, 194 F.Supp.2d at 212, *citing* <u>Guner v. Reno</u>, 2001 WL 940576 (S.D. N.Y. Aug. 20, 2001).  The court held that petitioner's continued detention was appropriate because he had not "provide[d] accurate and complete information to the INS," and that after he did so, it was likely that he would be removed.  <u>Powell</u>, 194 F.Supp.2d at 212.  *See also* <u>Archibald v. I.N.S.</u>, 2002 WL 1434391, *8 (E.D. Pa. July 1, 2002) (finding the case factually distinguishable from *Zadvydas* where "Archibald's detention [was] a direct result of his seeking relief from deportation" and holding that because his indefinite detention was a result of his requesting a stay, he could not "be

---

[8] This case was decided before <u>Zadvydas</u>.

heard to complain[] that the time period during which he has been detained constitute[d] a denial of due process."); <u>Thevarajah v. McElroy</u>, 2002 WL 923914 (E.D. N.Y. Apr. 30, 2002) (holding that petitioner's nearly five years in the custody of INS was constitutional following *Zadvydas* because the continued detention was lengthened largely because of petitioner's own actions); *cf.* <u>Seretse-Khama v. Ashcroft</u>, 215 F.Supp.2d 37 (D. D.C. July 22, 2002) (rejecting respondent's argument that petitioner "has not cooperated in obtaining travel documents because he told Liberian officials that he did not want to return to Liberia" and noting that INS had not argued that "petitioner refused to request travel documents or refused to be interviewed by Liberian officials" and did not deny "his Liberian citizenship, or gave false or misleading information that impeded the issuance of travel documents.").

Another recent case on this issue is <u>Pelich v. I.N.S.</u>, 329 F.3d 1057 (9th Cir. 2003), in which the court found that petitioner's detention was "indefinite only because he refuse[d] to cooperate with the Immigration and Naturalization Service's ("INS") efforts to remove him."  <u>Pelich</u>, 329 F.3d at 1057.  Thus, the court concluded that in those circumstances, the petitioner had "no cause to complain" and the denial of his § 2241 habeas petition was affirmed.  329 F.3d at 1057-58.

Additionally, relying on the decision from <u>Powell v. Ashcroft</u>, *supra*, which found that the removal period may be tolled where the alien acts to frustrate the Government's efforts to effect his or her removal, the Eastern District of New York has explained the various situations which have been held to toll the removal period:

Section 1231 states that if an alien acts to frustrate the INS' ability to remove him, the removal period is tolled during the period of the alien's actions. 8 U.S.C. § 1231(a)(1)(C); Powell v. Ashcroft, 194 F.Supp.2d 209, 210 (E.D. N.Y. 2002). The limited case law on what constitutes a "frustration of removal" has not interpreted this phrase expansively: courts have only tolled the removal period in cases where the alien has sought and received a stay of removal through judicial action (see Akinwale v. Ashcroft, 287 F.3d 1050, 1052 (11th Cir. 2002)), or where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing the INS with false or inconsistent information regarding his identity or country of origin (see Powell, supra; Ncube v. INS, No. 98 Civ. 0282, 1998 WL 842349 at *16 (S.D. N.Y. Dec. 2, 1998)), or refusing to complete travel arrangements or name a country for deportation (Riley v. Greene, 149 F.Supp.2d 1256, 1262 (D. Colo. 2001); Sango-Dema v. District Director, 122 F.Supp.2d 213, 221 (D. Mass. 2000); Cf. Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D. N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin)). Indeed, as Seretse-Khama has held, a petitioner's truthful statement (such as expressing that he did not wish to return to his country of origin) which is later adopted by the country of origin as a reason for not wanting to repatriate that alien, is not an example of refusal to cooperate under § 1231(a)(1)(C), and cannot be used as a grounds for extending post-removal detention. Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37, 50-53 (D. D.C. 2002).

Rajigah v. Conway, 268 F.Supp.2d 159, 165 (E.D. N.Y., 2003). In Rajigah, the court concluded that the petitioner did not act in bad faith simply because he requested a stay of removal and "availed himself of judicial process and communicated to the Guyanese embassy his plans to" file an action in court. 268 F.Supp.2d at 166.[9]

---

[9] Somewhat contrary to the Rajigah decision, though, is Akinwale v. Ashcroft, 287 F.3d 1050 (11th Cir. 2002). There, the petitioner was taken into custody by Immigration officials following release from incarceration. 287 F.3d at 1051. He filed a habeas petition just four months into his detention, asserting he "was being indefinitely detained . . . ." Id. The petition was denied based on a finding that the petitioner had not presented "a situation involving prolonged or indefinite detention pending removal." Id. In approving the dismissal of the case, the Eleventh Circuit Court of Appeals concluded that a four-month period of detention was not "prolonged" pursuant to Zadvydas, and, furthermore, the petitioner had not shown the unlikeliness of his removal in the foreseeable future. Id., at 1051-52. In a footnote, the Eleventh Circuit noted that

Cited in <u>Rajigah</u> is <u>Seretse-Khama v. Ashcroft</u>, 215 F.Supp.2d 37 (D. D.C. 2002).

There, the court determined that simply because an alien tells the Consul of his country

of citizenship that he did not want to return, he is not hindering his removal.  215

F.Supp.2d at 51.  The court noted that the petitioner had not " refused to request travel

documents or refused to be interviewed by Liberian officials." *Id.*  No claims were

before the court that the petitioner had denied his citizenship, "gave false or misleading

information that impeded the issuance of travel documents." *Id.*  Petitioner truthfully

answered the Consul's questions during an interview, but simply and "honestly told the

Consul that he did not want to return to Liberia in light of his lack of family in or ties to

Liberia, which he left . . . when he was only eight years old." *Id.*  The court concluded

that such a statement without more does not amount to a "bad faith failure to

cooperate." *Id.*[10]

---

Akinwale's filing of the stay of deportation "interrupted the running of time under
<u>Zadvydas</u>" and acted to extend his own removal period.  *Id.*, at 1052, n.4.  In this case,
the Petitioner has not moved to stay a final order of removal, and it was filed more than
two years after Petitioner was taken into custody..

[10] In a footnote, the court surveyed the case law on the issue of what "constitutes an
affirmative act that prevents one's return" or removal:

> Furthermore, most of the case law was decided before the Court's ruling in
> <u>Zadvydas</u>.  *See, e.g.*, <u>Bini v. Aljets</u>, 2002 WL 535083, 36 Fed.Appx. 868
> (8th Cir. 2002) (alien who obtained stay of proceedings in district court
> prevented his removal); <u>Powell v. Ashcroft</u>, 194 F.Supp.2d 209, 210-211
> (E.D. N.Y. 2002) (alien who claimed in four affidavits that he was from
> U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false
> name and false date of entry, prevented his removal); <u>Riley v. Greene</u>,
> 149 F.Supp.2d 1256, 1262 (D. Colo. 2001) (alien who admitted he refused
> to complete travel arrangements and refused to name any country for
> deportation); <u>Sango-Dema v. District Director</u>, 122 F.Supp.2d 213, 221 (D.
> Mass. 2000) (alien who refused to provide passport and birth certificate,

It appears in this case, that Petitioner's six-month period of removal pursuant to Zadvydas has been tolled as permitted by 8 U.S.C. § 1231(a)(1)(C).  In other words, the period of time by which an alien is non-cooperative, tolls the six months of presumptively reasonable period of time for removal as announced in Zadvydas.  *See* Francois v. Chertoff, 2006 WL 2668193, *3 (D. N.J., 2006) (citations omitted).

Petitioner's order of removal became administrative final on July 21, 2004, and just a month later, on August 27, 2004, Petitioner refused to sign the Warning for Failure to Depart form and refused to complete and sign the Chinese passport application.[11]  It appears that Petitioner has refused on several other occasions to cooperate with the Government's removal efforts.  Petitioner acknowledges the fact that he refused to sign an I-229 form[12] on August 27, 2004.  Doc. 20; *see* Ex. F.  Petitioner asserts, though, that he has cooperated since that time and has filled out passport applications on numerous occasions.  Doc. 20.  There has been no demonstration of such efforts, however, beyond Petitioner's own statement in his Reply.  Doc. 20.

---

and refused to communicate with embassy officials or complete application for documents); Ncube v. INS, 1998 WL 842349, *16 (S.D. N.Y. Dec. 2, 1998) (failing to provide INS with passport or proof of identification or nationality; many statements false or at least contradictory); *cf.* Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D. N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).

215 F.Supp.2d at 51, n.18.

[11] Petitioner's initial contact with Immigration officials was also uncooperative when he refused to sign the "Record of Deportable/Inadmissible Alien" on July 19, 2003, in the Virgin Islands.

[12] The I-229(a) form is the "Warning for Failure to Depart" form.  *See* ex. F.

The documentary evidence in this case reveals that each time Petitioner was given an Instruction form, every box on that form was checked indicating a number of things Petitioner was required to do to assist in his removal.  There is no evidence that he provided that information.  Additionally, as recently as May of 2006, just a month before Petitioner initiated this case, he was requested by the Chinese Consulate to fill out a form in Chinese.  On that form, Petitioner begged the Consulate to not issue travel documents for him.  Ex. Q.  His statements on the form go beyond simply stating he did not want to return.  He was attempting to thwart the removal process.  He also did not fully complete the form because in response to numerous questions such as his occupation in China, his passport or identification card, his ID number, place where it was issued, and date when he left China, Petitioner responded with "None."  Ex. Q.  Thus, even his most recent actions in May, 2006, were designed to hinder his removal.

Petitioner's actions have impeded the removal process by not providing the Consulate with necessary information such as his identification number or passport.  He has begged to not have travel documents processed, and considered along with the fact that there is no evidence he has produced any of the necessary information for his removal, including identification numbers, the conclusion to be reached is that Petitioner has created the delay in his removal and the extended detention he now endures.

It must be noted in closing that the Chinese Consulate General has not issued travel documents for Petitioner.  That inability, however, appears to be based on the fact that Petitioner's household registration could not be located in China and, correspondingly, his Chinese citizenship could not be confirmed.  That scenario is a

result of the lack of information Petitioner provided to the Consulate of the People's Republic of China.  Petitioner has caused the extended detention about which he now complains because of his failure to cooperate.  It is far from clear, in light of the number of persons who have been repatriated to China, that if Petitioner provides all the information requested on the form and does not simply respond with "none," that Petitioner could not be returned to China, or even removed to a substitute country.

Accordingly, it is **RECOMMENDED** that the petition for a writ of habeas corpus, doc. 1, filed by Jian Bin Tang pursuant to 28 U.S.C. § 2241, be **DENIED.**

**IN CHAMBERS** at Tallahassee, Florida, on October 13, 2006.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**